**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 20-14056-CIV-ROSENBERG/MAYNARD**

**DAVID WICKLINE,**

**Plaintiff,**

**v.**

**ANDREW M. SAUL, Commissioner,**
**Social Security Administration,**

**Defendant.**

_____/

**REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR SUMMARY**
**JUDGMENT (DE 19 & 20)**

THIS CAUSE comes before the Court on the Parties' cross-motions for summary judgment

(DE 19, 20).  These Motions were referred to the undersigned United States Magistrate Judge by

the Honorable Robin L. Rosenberg, United States District Judge, for a Report and

Recommendation (DE 2).  Upon consideration of the briefing and the record, and being otherwise

fully advised in the premises, the undersigned respectfully recommends that Plaintiff's Motion

(DE 19) be denied and Defendant's Motion (DE 20) be granted.

**BACKGROUND**

This case involves the determination of Plaintiff David Wickline's ("Plaintiff") application

for disability insurance benefits filed on August 23, 2016.  R.[1] 162-63.  Plaintiff alleges disability

beginning on January 1, 2013 due to hepatitis C, fibromyalgia, sciatica, spinal fusion, degenerative

disc disease, unspecified stomach problems, blindness in right eye, carpal tunnel syndrome,

---

[1] References to "R. –" are to pages of the transcript of the administrative record filed at DE 17.  The page numbers correspond to the sequential numbers at the lower right corner of the record and not the page numbers assigned by the court's electronic filing system.

tendonitis, and problems with his right knee.  R. 162, 182.  Plaintiff's application was denied both initially and upon reconsideration.  R. 77, 87, 91-99.  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), and a hearing was held on February 8, 2019.  R. 35, 124. Plaintiff, represented by counsel, testified.  R. 35, 37-38, 43-58.  Vocational Expert Jessica Earl also testified.  R. 35, 58-66.

On March 6, 2019, the ALJ issued an unfavorable decision finding the Plaintiff was not disabled as defined by the Social Security Act.  R. 9-23.  In her decision, the ALJ noted that Plaintiff was born on April 23, 1960 and was 56 years old, which is defined as an individual closely approaching advanced age, on the date last insured.  R. 20.  She further noted that Plaintiff had some earnings in 2013 and did "odd jobs" in the interim but found he had not engaged in substantial gainful activity since the alleged onset date.  R. 15.  The ALJ determined that Plaintiff had the severe impairments of hepatitis C, gastritis, abdominal pain, and cataracts.  *Id.*  Considering all of Plaintiff's symptoms, the ALJ determined that Plaintiff had the residual functional capacity to perform medium work as defined in 20 CFR § 404.1567(c), with certain exceptions and limitations.  R. 16.  The ALJ determined that Plaintiff could frequently operate foot controls; frequently balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; occasionally climb ropes, ladders, or scaffolds; could handle and work with large objects such as boxes, laundry, buckets, and brooms; and could not read very small print such as an ingredient label.  *Id.*  The ALJ noted that Plaintiff had limited education and previously worked as a dry wall installer.  R. 20, 21. The ALJ found that Plaintiff could no longer perform his past work, but could hold the following positions: hospital cleaner, dining room attendant, and hand packager.  R. 20-21.  Ultimately, the ALJ concluded that Plaintiff was not disabled.  R. 22.

Plaintiff requested administrative review of the ALJ's decision.  R. 159-60.  The Appeals

Council denied Plaintiff's request, R. 1, consequently rendering the ALJ's decision "final."  42

U.S.C. § 405(g); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  Plaintiff now seeks

judicial review of the ALJ's decision in this case.  DE 1, 19.  Plaintiff has exhausted his

administrative remedies and, as such, this case is ripe for review under 42 U.S.C. § 1383(c).

## STANDARD OF REVIEW

A district court's review of the Commissioner's decision is limited to determining whether

the decision as a whole is supported by substantial evidence in the record.  *Dyer v. Barnhart*, 395

F.3d 1206, 1210 (11th Cir. 2005).  Substantial evidence is defined in this context as relevant

evidence which a reasonable person would accept as adequate to support the conclusion reached.

*Williams v. Astrue*, 416 F. App'x 861, 862 (11th Cir. 2011);  *see also Hale v. Bowen*, 831 F.2d

1007, 1011 (11th Cir. 1987) (substantial evidence is "more than a mere scintilla, but less than

preponderance") (quoting *Bloodworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).  "[T]he

threshold for such evidentiary sufficiency is not high."  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154

(2019).  In determining whether substantial evidence exists, the court must scrutinize the record in

its entirety, considering evidence favorable as well as unfavorable to the Commissioner's decision.

*Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995).  If the Commissioner's decision is found to

be supported by substantial evidence, then the reviewing court must affirm the decision, even if

proof preponderates against it.  *Dyer*, 395 F.3d at 1210.  It is not the place of the reviewing court

to reweigh the evidence or substitute its judgment for that of the Commissioner.  *Id*.

A claimant must be "disabled" to be eligible for SSI.  A claimant is disabled if he is unable

to "engage in any substantial activity by reason of any medical determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last

for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(A).  A "physical or mental impairment" is one that "results from anatomical, physiological or psychological abnormalities which are demonstrable by medically accepted clinical and laboratory diagnostic techniques."  42 U.S.C. § 1382c(a)(3)(D).  A claimant bears the burden of proving that he is disabled.  *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003); 20 C.F.R. §§ 404.1512(a), 416.912(a).

The Social Security regulations require the ALJ to undertake a five-step, "sequential" evaluation process for determining whether a plaintiff is disabled.  At step one, the ALJ must determine whether the plaintiff is currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the ALJ determines the plaintiff is engaging in substantial gainful activity, then he or she is not disabled.  *Phillips v. Barnhart*, 357 F.3d 1232, 1237 (11th Cir. 2004).  At step two, the ALJ must determine whether the plaintiff suffers from a medical determinable impairment, or a combination of medically determinable impairments that is "severe".  20 C.F.R. §§ 404.1520(c), 416.920(c).  An impairment is "severe" within the meaning of the regulations if it significantly limits a plaintiff's ability to perform basic work activities.  An impairment is "not severe," however, when medical or other evidence establish just slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on a plaintiff's ability to work.  *Id*. at §§ 404.1522, 416.922; Social Security Rulings ("SSRs") 85-28, 16-3p.  At step three, the ALJ must determine whether the plaintiff's impairment(s) meet or equal the criteria of an impairment listed under 20 C.F.R. §§ 404, Subpart P, Appendix 1.  If so, the plaintiff is considered disabled; if not, then the analysis proceeds to step four.

Step four is a two-prong process where the ALJ must assess: (1) the plaintiff's residual functional capacity ("RFC") and (2) the plaintiff's ability to return to his or her past work.  The

regulations define RFC as the most a plaintiff can still do despite the limitations caused by his or her impairments.  20 C.F.R. § 404.1545(a).  Once the ALJ determines the RFC, the ALJ must determine whether the plaintiff has the RFC to perform any past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  If the plaintiff can return to his or her past relevant work, then the plaintiff is not disabled.  If the plaintiff cannot perform past relevant work, then a *prima facie* case of disability is established and the analysis proceeds to step five where the burden shifts to the Social Security Administration to show that there is other work in the national economy that the plaintiff can perform.  *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018).  The ALJ considers the plaintiff's RFC, age, education, and work experience to determine whether the plaintiff is capable of adjusting to other work.   If the plaintiff can make an adjustment to other work that exists in the national economy, then the plaintiff is not disabled.  If not, the plaintiff is considered disabled.  20 C.F. R. §§ 404.1520(g), 416.920(g).

## DECISION OF THE ADMINISTRATIVE LAW JUDGE

The ALJ in this case proceeded through the five-step analysis as follows:  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged disability onset date of January 1, 2013.  R. 14-15.  At step two, the ALJ found that Plaintiff had the following severe impairments: hepatitis C, gastritis, abdominal pain, and cataracts.  R. 15.  At step three, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR §§ 404.1520(d), 404.1525, 404.1526.  R. 16.  The ALJ then found that Plaintiff has the RFC to:

> perform medium work as defined in 20 CFR 404.1567(c) except he could frequently operate foot controls.  He could frequently balance, stoop, kneel, crouch, crawl, and climb ramps and stairs.  He could occasionally climb ropes, ladders, or scaffolds. He could handle and work with large objects such as boxes, laundry, buckets, and brooms. He could not read very small print such as an ingredient label.

R. 16.  At step four, the ALJ determined that Plaintiff was unable to perform any past relevant work.  R. 19.  At step five, considering Plaintiff's age, education, work experience, and RFC, the ALJ found that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform.  R. 20.  These jobs include: hospital cleaner (DOT 323.687-010), with approximately 85,000 jobs in the national economy; dining room attendant (DOT 311.677-018), with approximately 60,000 jobs in the national economy; and hand packager (DOT 920.587-018), with approximately 40,000 jobs in the national economy.  R. 20-21.  Accordingly, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act at any time from January 1, 2013, through March 6, 2019, the date of the decision.  *Id*.

## DISCUSSION

Plaintiff argues that the ALJ erred in three ways.  DE 19 at 1.  First, the ALJ failed to properly consider the impact of  Plaintiff's vision impairment in determining the RFC because she did not include a limitation about Plaintiff's challenges with near vision and his inability to see in bright light.  *Id.* at 6-8.  Second, the ALJ did not properly assess Plaintiff's back impairment or adequately consider limitations related to it.  *Id.* at 8-10.  Third, the ALJ's conclusion that jobs exist in the national economy that Plaintiff can perform is not supported by substantial evidence because the ALJ relied on the testimony of a vocational expert who relied solely on a third-party software that other courts have found to be unreliable.  *Id.* at 10-14.

The Court considers each of Plaintiff's arguments in turn.

## I.      Whether the ALJ Erred in her Consideration of Plaintiff's Vision Impairment in Making the RFC Determination

Plaintiff first argues that the ALJ failed to properly consider his visual impairment as part of the RFC assessment such that the RFC determination is not supported by substantial evidence.  DE 19 at 6-7.  Plaintiff contends the limitations do not properly account for his issues with near

vision or glare and bright lights.  DE 19 at 7.  Defendant argues the ALJ properly considered the medical evidence.  DE 25.

### A.    The Medical Evidence Relating to Plaintiff's Vision

The following are the medical records from the Administrative Record that relate to Plaintiff's vision.  On March 31, 2017, Plaintiff sat for a consultative examination with Rodger Argumugam, M.D.  R. 304-306.  Among his chief complaints was "blindness right eye."  *Id.* at 304.  Dr. Argumugam noted that Plaintiff did not wear glasses, he could see color with both eyes, his pupils reacted to light and accommodation, and his peripheral visual fields were intact.  *Id.* The results of his eye exam were "L. eye 20/25; R. eye 20/0; Both 20/25."[2]  *Id.*

A month later on May 1, 2017, while visiting the hospital for back pain, Plaintiff reported that he got something in his left eye six months prior and could not see.  R. 343.  He also reported pain in his right eye and a progressive decrease in vision in his right eye over the prior six months. *Id*. at 343-44.  According to the hospital note, while his right pupil was cloudy, both pupils were equal, round, and reactive to light and accommodation.  *Id.* at 344.

The next medical record regarding Plaintiff's eye was generated on July 31, 2017.  Plaintiff presented to Samaritans Touch Care Center complaining he could not see from his right eye.  *Id.* 366.  Dawn Plsarski, ARNP, assessed Plaintiff as having an unspecified kind of cataract and referred him to an ophthalmologist.  *Id.*

Plaintiff next had an eye examination with Angela Anderson, D.O., on September 26, 2017. *Id.* at 352.  He complained of decreased distance, near, peripheral, and central vision.  R. 352. Without correction, the visual acuity in Plaintiff's right eye was limited to hand motions and visual

---

[2] Given the way eye exam results are expressed, *see infra* note 4, the Court presumes the 0 denominator in Plaintiff's "20/0" right eye result was a typographical error.

acuity in his left eye was 20/25-.[3]  *Id.*  Without correction, the near visual acuity in his right eye

was limited to hand motions and the near visual acuity in his left eye was J13.[4]  *Id.*  Presbyopia—

farsightedness that occurs with age—and cataracts were present in both eyes.  *Id.* at 353.  Plaintiff

had no pain and full motility[5] in both eyes.  *Id.*  Dr. Anderson recommended reading glasses and

referred Plaintiff for cataract surgery.  *Id.*

On December 27, 2017, Plaintiff presented to Eye Specialists of Mid-Florida, P.A.,

complaining of blurry vision.  R. 477.  He reported a history of trouble focusing both near and at

a distance, more so with his right eye than his left.  *Id.*  He also indicated he could not drive due to

glare.  *Id.*  Without correction, the visual acuity in Plaintiff's right eye was limited to light

perception and in his left was 20/70+.  *Id.*  The near visual acuity without correction was also

limited to light perception for Plaintiff's right eye and was J10 for his left.  *Id.*  In a glare test, the

visual acuity in Plaintiff's right eye was light perception and the visual acuity in his left eye was

---

[3] Visual acuity is the clarity or sharpness of one's vision.  During a typical visual acuity test, an individual reads progressively smaller lines of letters from a standardized chart—a Snellen chart—held 20 feet away. U.S. National Library of Medicine, *Visual Acuity Test*, https://medlineplus.gov/ency/article/003396.htm (last visited February 14, 2021).  Visual acuity is expressed as a fraction where the top number refers to the distance the individual stood away from the chart and correctly read a given line of letters—typically 20 feet—and the bottom number indicates the distance at which a person with normal eyesight could read the same line.  *Id.*  Normal visual acuity is generally expressed as 20/20.  *Id.*  Someone with 20/40 vision, for example, correctly read a line at 20 feet away that could be read by a person with normal vision at 40 feet away.

[4] Near visual acuity is the clarity or sharpness of one's vision when viewing close-by objects.  An individual's near visual acuity is tested with a reading card or a reduced eye chart featuring ascending text sizes—a Jaeger chart—typically held 14 inches from the face. Jeffrey H. Levenson & Alan Kozarsky, *Visual Acuity*, *in* CLINICAL METHODS: THE HISTORY, PHYSICAL, AND LABORATORY EXAMINATIONS (3rd ed. 1990).  An individual's Jaeger score—denoted J1, J2, etc.—corresponds to the smallest text the individual could read.  JIM SCHWIEGERLING, FIELD GUIDE TO VISUAL AND OPHTHALMIC OPTICS 19 (2004).  Newsprint is typically between 10- and 14-point font, which corresponds to between J7 and J10.  *Id.*  Jaeger charts are not standardized, however, which can cause issues or inconsistencies in testing.  *See id.*; August Colenbrander & P. E. Runge, *Can Jaeger Numbers Be Standardized*, 48 INVESTIGATIVE OPHTHALMOLOGY & VISUAL SCIENCE 3563 (2007).

[5] Extraocular muscle function testing exams the functioning of the eye muscles and concerns the movement and alignment of an individual's eyes.  U.S. National Library of Medicine, *Extraocular Muscle Function Testing*, https://medlineplus.gov/ency/article/003397.htm (last visited February 14, 2021).

20/400.[6]  *Id.* at 478.  He had full motility in both eyes, full confrontational visual field in his left

eye, and no confrontational visual field in his right.  *Id.*  David Loewy, M.D., diagnosed Plaintiff

with cataracts in both his left and right eyes, including a "total or mature" senile cataract in his

right, and prescribed him medicated eye drops.  *Id.* sat 479.  He scheduled Plaintiff to have surgery

to remove the cataracts in his right eye within the following two weeks.  *Id.* at 479-80.

Plaintiff had cataract surgery on his right eye on January 10, 2018.  *See id.* at 470.  He

returned to Eye Specialists of Mid-Florida on January 11, 2018 for a post-operation appointment.

*Id.* at 474.  Plaintiff reported his condition was much better than before the surgery.  *Id.* Without

correction, the visual acuity in Plaintiff's right eye was now 20/40- and his left was 20/40-.  *Id.*

The near visual acuity without correction in both of his eyes was J10.  *Id.*  No glare test was

reported.  *See id.* 474-76.

On January 17, 2018, Plaintiff again presented to the Eye Specialists of Mid-Florida.  *Id.*

at 470.  Without correction, the visual acuity in Plaintiff's right eye was 20/20- and his left was

20/50.  *Id.* at 471.  The near visual acuity without correction in his right eye was J10 and his left

eye was J16.  *Id.*  A glare test was only reported for Plaintiff's left eye, which had a visual acuity

of 20/400.  *Id.*  He had full confrontation visual fields and full motility in both eyes.  *Id.*  The doctor

noted Plaintiff's right eye was progressing nicely after surgery.  *Id.* at 473.  Because his vision had

continued to decrease in his left eye, Plaintiff expressed desire to have surgery to remove the

cataract in his left eye as well.  *Id.*  Cataract removal surgery was scheduled for January 31, 2018,

*id.*, however no medical records related to this surgery are in the Administrative Record.[7]

---

[6] A glare test examines the reduction of an individual's visual acuity as a result of light elsewhere in their field of vision. For example, oncoming headlights might reduce visual function when driving at night. *See* Tariq M. Aslam, David Haider, & Ian J. Murray, *Principles of Disability Glare Measurement: An Ophthalmological Perspective*, 85 ACTA OPHTHALMOLOGICA SCANDINAVICA 354 (2007).

[7] Although no there are no medical records related to Plaintiff's cataract removal surgery for his left eye, the Court presumes he had the surgery given his testimony before the ALJ.  *See* R. 52 ("Ma'am, I had cataracts in both eyes. I was totally blind in my right eye. And thank God, Samaritan's Touch sent me to the eye doctor, and they put in a --

At the February 8, 2019 hearing before the ALJ, Plaintiff testified that his vision greatly improved after cataract surgery. *Id.* at 52. He stated, however, "they didn't put the really good ones in, 'cause I can't see up close. They said, we're just going to put the ones where you can see far away. But you're going to have to get reading glasses to read up close." *Id.* Plaintiff further testified he was not using glasses because "I can't afford them. I can't afford to go to the optometrist, or whatever. I don't have the money." *Id.* at 54. He explained he could not see things up close like the print of a newspaper, for example. *Id.* He reported driving a couple of times a week and drove himself to his hearing. *Id.* at 44, 57. He did not mention any issues with glare in his testimony.

**B.      Substantial Evidence Supports the ALJ's RFC Determination**

Plaintiff argues that the ALJ failed to properly consider his visual impairment in making her RFC determination. DE 19 at 6-7. He acknowledges that after his cataract surgery he does not have issues with his distance vision. *Id.* at 7. Instead, the issue is with his near vision and glare. As to his near vision, Plaintiff argues the RFC limitation regarding small print does not address the problem because it is the distance away from the print and not the size of the print that matters. He also argues that while he would be able to read items up close with the help of reading glasses, the ALJ overlooked his testimony regarding his inability to afford glasses, which excuses his noncompliance with the treatment. *Id.* at 8. As to glare, Plaintiff notes his complaints of blurry vision and difficulty driving, as well as his glare testing showing 20/400 vision acuity to argue the RFC is unlawfully incomplete. *Id.*

Plaintiff's argument that the RFC determination is insufficient because it does not include a limitation regarding glare in unpersuasive. In making his argument, he relies on a single glare

---

they got the cataracts out, and they put in some lenses for me, God bless them. . . And thank God, they did that for me. I was totally blind in my right eye; couldn't see nothing. And I was going blind in my left.").

test of his left eye from January 17, 2018 to suggest the RFC needed a limitation to address glare. DE 19 at 8 (citing R. 471). However, at that point Plaintiff had a cataract in his left eye that needed to be removed. *See* R. 471 (scheduling cataract removal surgery for Plaintiff's left eye on January 31, 2018). There is no medical evidence in the record except the pre-cataract-removal-surgery test to support Plaintiff's claim that even since surgery he cannot see under certain lighting conditions. Moreover, "a diagnosis or a mere showing of' 'a deviation from purely medical standards of bodily perfection or normality' is insufficient; instead, the claimant must show the effect of the impairment on [his] ability to work." *Wind v. Barnhart*, 133 F. App'x 684, 690 (11th Cir. 2005). There is no indication in the record that glare limits Plaintiff's ability to work, particularly when the glare exam did not test Plaintiff's right eye, which was dramatically improved at the time, and Plaintiff since testified that he drives several times a week, expressing no difficulty visually in doing so. *See* R. 471, 57 (Plaintiff's testimony that he has difficulty driving because numbness in his hands causes trouble gripping the steering wheel).

As to Plaintiff's near vision, the RFC limitation that he "could not read very small print such as an ingredient label" sufficiently addresses his impairment. Plaintiff argues to the contrary because "[the] issue is not with just reading very small print, it also the distance from the print— when the item to read is near him, the closer is the distance, the harder it is to read for the Plaintiff." DE 19 at 7-8. This argument lacks merit as the two are obviously interrelated and, according to Plaintiffs' providers, reading glasses are the appropriate remedy. Plaintiff says he cannot afford reading glasses, however, and this excuses noncompliance. DE 19 at 8. Social Security regulations provide that an individual's refusal to follow prescribed medical treatment without a good reason will preclude a finding of disability. *See* 20 C.F.R. § 416.930(b); *see, e.g., Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987) ("A medical condition that can reasonably be remedied

either by surgery, treatment, or medication is not disabling." (footnote omitted)). And the Court

agrees with Plaintiff that, generally, poverty constitutes a good reason and excuses noncompliance.

*Dawkins v. Bowen*, 848 F.2d 1211, 1213 (11th Cir. 1988). However, this argument is misplaced

in this case because the ALJ did not deny Plaintiff benefits on the basis that he failed to follow

prescribed treatment. *See id.* ("In order to deny benefits on the ground of failure to follow

prescribed treatment, the ALJ must find that had the claimant followed the prescribed treatment,

the claimant's ability to work would have been restored."). Rather than dismiss Plaintiff's near

vision impairment as remediable with glasses, the ALJ included a limitation in Plaintiff's RFC to

account for it.[8] Accordingly, his inability to acquire glasses, whether valid or not, is not relevant

to the RFC determination in this case.

Additionally, any error regarding limitations as to Plaintiff's near vision is harmless given

the VE's testimony that Plaintiff would still be capable of performing the jobs of hospital cleaner

and dining room attendant even with no near visual acuity. R. 64-65. Based on the foregoing, the

ALJ's RFC determination is supported by substantial evidence.


**II.** **Whether the ALJ Erred in Assessing Plaintiff's Back Impairment**

At the second step of the sequential evaluation, the ALJ considers the medical severity of

an applicant's impairments. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment or combination of

impairments is not severe if it does not significantly limit a claimant's physical or mental ability

to do basic work activities. *Id.* § 404.1522(a). If the ALJ finds an applicant does not have an

---

[8] However, had the ALJ found Plaintiff's near eye impairment not disabling because it could be sufficiently addressed with reading glasses, the Court would be unpersuaded by Plaintiff's argument that his noncompliance should be excused because he could not afford them. While it can be expensive to obtain prescription eyeglasses, over the counter eyeglasses are very inexpensive and readily available. *See, e.g.,* The Cleveland Clinic, *Are Drugstore 'Cheaters' as Good as Prescription Reading Glasses?*, https://health.clevelandclinic.org/are-drugstore-cheaters-as-good-as-prescription-reading-glasses/ (last visited Feb. 14, 2021).

impairment or combination of impairments that is severe and meets the applicable duration requirements, the ALJ will find an applicant not disabled at step two. *Id.* § 404.1520(a)(4)(ii).

At the second step in this case, the ALJ determined that Plaintiff had the following severe impairments: hepatitis C, gastritis, abdominal pain, and cataracts. R. 15. As to Plaintiff's back pain, the ALJ found "there is insufficient evidence [it] more than minimally affected his ability to work" and thus found it to be non-severe. *Id.*

Plaintiff claims the ALJ erred in finding his back impairment to be non-severe given his lumbar spine MRIs from 2009 and 2010 that showed abnormalities and his testimony regarding the scope and impacts of his pain. DE 19 at 9. In response to the ALJ's reliance on x-ray imaging, Plaintiff contends his MRIs are more useful in analyzing soft-tissue or disc damage. He then cites to a Supplemental Pain Questionnaire in which Plaintiff detailed his "always there" pain which makes walking "difficult at best." *Id.* (citing R. 196, 199). He also refers to his testimony from the hearing before the ALJ that he can only make it to the mailbox and back. *Id.* at 10 (citing R. 56). In light of this, Plaintiff contends, the ALJ failed to adequately consider his back impairment. *Id.*

The undersigned finds the ALJ's finding at step two that Plaintiff's back condition is non-severe is supported by substantial evidence. The ALJ discussed in detail evidence from the record pertaining to Plaintiff's back, including the MRIs Plaintiff relies on in making his argument, and found it insufficient to conclude Plaintiff's impairment has more than a minimal impact on his ability to work. R. 15. *See Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) (noting the burden in on a claimant at step two to prove he is suffering from a severe impairment). The ALJ noted that the 2010 MRI showed a shallow disc herniation but that it was an improvement over prior studies, which would include the 2009 MRI. R. 15. Statements from Plaintiff's Pain

Questionnaire, dated March 3, 2017, are in conflict with the doctor's observation notes from Plaintiff's consultative exam with Dr. Argumugam on March 31, 2017. *Compare* R. 196-199 *with* R. 304-306. Whereas Plaintiff claimed walking was difficult at best, Dr. Argumugam noted Plaintiff could walk without assistance, had a normal gait, and got onto the examination table without difficulty. *Id.*; R. 15. An x-ray taken May 1, 2017, showed no degenerative disc disease and only minimal arthritis in Plaintiff's back. *Id.* The ALJ also considered that the record shows Plaintiff took non-narcotic medication to treat his back pain, has not required further emergency treatment, and has not had injections, narcotic medication, or surgery for his back. R. 15. Given the ALJ's consideration of evidence from the record, her determination that Plaintiff's back impairment was not severe is supported by substantial evidence. *See Delia v. Comm'r of Soc. Sec.*, 433 F. App'x 885, 887 (11th Cir. 2011) ("Substantial evidence is . . . such relevant evidence as a reasonable person would accept as adequate to support a conclusion." (internal quotation omitted)).

Even if the ALJ erred in finding Plaintiff's back condition non-severe, however, this mistake would not result in reversible error because she found other conditions severe at step two and considered Plaintiff's back condition at later stages of her analysis. The United States Court of Appeals for the Eleventh Circuit ("Eleventh Circuit") has described step two as a "filter" designed to screen out groundless claims, requiring the denial of any disability claim where no severe impairment or combination of impairments is present. *Tuggerson-Brown v. Comm'r of Soc. Sec.*, 572 F. App'x 949, 950–51 (11th Cir. 2014). Indeed, at step two the ALJ is not required to identify all of the impairments that should be considered severe. *Heatly v. Comm'r of Soc. Sec.*, 382 F. App'x 823, 825 (11th Cir. 2010). To proceed to step three of the evaluation process, an ALJ need only conclude that an applicant had at least one severe impairment. *Id.* at 824 ("Even if

the ALJ erred in not indicating whether chronic pain syndrome was a severe impairment, the error was harmless because the ALJ concluded [claimant] had a severe impairment; and that finding is all that step two requires."); *see also Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987) ("[T]he finding of any severe impairment, . . . whether or not it results from a single severe impairment or a combination of impairments that together qualify as severe, is enough to satisfy the requirement of step two."). The ALJ found four of Plaintiff's conditions to be severe at step two and thus she continued with the sequential evaluation.  R. 15-16.  She then considered Plaintiff's back impairment in determining Plaintiff's RFC.  *See Delia v. Comm'r of Soc. Sec.*, 433 F. App'x 885, 887 (11th Cir. 2011) ("Because the ALJ gave full consideration to the consequences of Delia's mental impairments on his ability to work at later stages of the analysis, the error at step two was harmless and is not cause for reversal."). Based on the foregoing, the ALJ's finding that Plaintiff's back impairment was non-severe does not warrant remand.

III.    **Whether the ALJ's Conclusion that Jobs Exist in Significant Numbers in the National Economy is Supported by Substantial Evidence**

At step five of the sequential evaluation process, the Social Security Administration has the burden to show that there exist other jobs in the national economy besides a plaintiff's past relevant work that he can perform given his impairments.  *See Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018); 20 C.F.R. §§ 404.1520(a), 416.920(a).  In determining whether a job exists in sufficient numbers to exist in the national economy, the Social Security Administration does not tally the number of job openings at a given time, but rather approximates the number of positions that exist.  *Goode v. Comm'r of Soc. Sec.*, 966 F.3d 1277, 1280 (11th Cir. 2020). The ALJ takes administrative notice of job information available from various governmental publications, including the Dictionary of Occupational Titles ("DOT"), published by the Department of Labor.  20 C.F.R. §§ 404.1566, 416.966.  She may also rely on the knowledge

or expertise of a vocational expert ("VE").  *Id.*; *Washington*, 906 F.3d at 1360 ("[T]he ALJ can

consider both jobs data drawn from the DOT as well as from the testimony of the VE in making

this determination.").  The ALJ must identify the specific jobs that the plaintiff can perform and

that finding must be supported by substantial evidence.  *Teague v. Comm'r of Soc. Sec.*, 743 F.

App'x 410, 411 (11th Cir. 2018).

Estimating the number of jobs in the national economy is not a straightforward task.  The

DOT groups similar jobs into "occupations" and assigns each occupation a code number.  *Goode*,

966 F.3d at 1281.  The DOT does not, however, provide statistical information about the number

of jobs available in the national economy for each code.  *Id.*  Instead, a VE must look to other

sources to find employment statistics.  The Bureau of Labor Statistics—a division of the United

States Department of Labor—provides one such source in its Occupational Employment Statistics

("OES") program.  *See* Occupational Employment Statistics, Bureau of Labor Statistics,

https://www.bls.gov/oes/oes_emp.htm (last visited February 10, 2021).  The OES conducts a

semiannual survey to produce estimates of employment and wages for specific occupations.  *Id.*

The OES survey data is compiled by the Standard Occupational Classification (SOC) system,

however, not by DOT codes.  *Id.*  The SOC system groups together detailed occupations with

similar job duties such that a single SOC group may contain multiple DOT occupations.  *Goode*,

966 F.3d at 1281. Therefore, the number of jobs in an SOC group does not directly correspond to

and the number of jobs of a single DOT occupation.  Because of this, after a VE determines the

total number of jobs in an SOC group, she needs to take a further step to approximate how many

of that total correspond to the specific DOT job a claimant can perform.  *Id.* at 1283.

Plaintiff argues the ALJ's determination in this case that sufficient jobs exist in the national

economy is not supported by substantial evidence because the ALJ relied on testimony from the

VE regarding job number information, who in turn "solely relied" on the Job Browser Pro third-party software.  DE 19 at 10-14.  He contends that although the Job Browser Pro numbers come from credible government sources, the Social Security Administration does not take administrative notice of the software's methodology for concluding job numbers for each individual DOT occupation.  *Id.* at 13.  And, he continues, the VE may not rely on the Job Browser Pro as the sole source of job numbers provided.  *Id.*  In support, he quotes the following portion of the VE's testimony:

> [Attorney:]    What is the source of the job numbers that you've provided?
>
> [VE:]    The Department of Labor Bureau of Labor Statistics.
>
> [Attorney:]    And did you use any third-party sources, like SkillTRAN? Like Job Browser Pro or U.S. Publishing?
>
> [VE:]    I utilized, too, Job Browser Pro. But the sources of their numbers is the Department of Labor Bureau of Labor Statistics.
>
> ***
>
> [Attorney:]    And did you use—just to clarify—did you use anything else, then, besides SkillTRAN and—... Job Browser Pro and Bureau of Statistics.
>
> [VE:]    No.

*Id.* (quoting R. 71).  Plaintiff raised a similar argument before the ALJ in objecting to the use of the VE's testimony regarding jobs numbers, but that objection was overruled.  R. 21-22.

In support, Plaintiff cites to several district court decisions finding a VE's exclusive reliance on the raw number of jobs produced by the Job Browser Pro software insufficient to provide substantial evidence at step five of the sequential evaluation.  *See, e.g., Thompson v. Comm'r of Soc. Sec.*, No. 2:15-CV-53-FTM-CM, 2016 WL 1008444 (M.D. Fla. Mar. 15, 2016).  Those cases suggest there is no error in a VE's use of this software when she also relies on her

experience and knowledge in determining job numbers. *Id.* ("Unlike other cases in which courts have upheld a VE's testimony . . . in the present case, the VE testified that she relied exclusively on the software and not on her own knowledge and expertise. In fact, when counsel sought clarification on how the VE derived the numbers . . . the VE's last response on this issue was, "'again, I'm not an economist or anything like that.'"); *see also Maniscalco v. Colvin*, 167 F. Supp. 3d 207, 220 (D. Mass. 2016); *Dorman v. Soc. Sec. Admin.*, No. 12–40023–TSH, 2013 WL 4238315, at *7–8 (D. Mass. May 21, 2013); and *Wright v. Colvin*, No. 14-CV-1113-CJP, 2015 WL 7293319, at *6 (S.D. Ill. Nov. 19, 2015).

In a more recent opinion, the Eleventh Circuit considered this issue last year in *Goode v. Commissioner of Social Security*, 966 F.3d 1277.   Although the decision was remanded to the Social Security Administration, it was not remanded due to the use of the software.  Rather, the VE made two mistakes that warranted remand.  First, the VE identified the DOT job title at issue as part of the wrong SOC group.  *Id.* at 1282.  Second, the VE testified that jobs for a specific occupation existed in the national economy based on the job numbers for that entire SOC group, rather than reduce the number to account for the fact that the SOC group consisted of several DOT jobs.  *Id.*  at 1283.  There is no indication that either mistake happened in this case.  In discussing the derivation of DOT job numbers from broader SOC group totals, the Eleventh Circuit stated one method—the occupational density method—is to "approximate[] job numbers using a software program known as Job Browser Pro from SkillTRAN, which interprets available data." *Id.* at 1284.    In describing the method, the Eleventh Circuit did not include the additional requirement that a VE using the occupational density method also specifically testify that the job number estimates were made using her knowledge and experience.  Indeed, such a requirement would mandate formulaic testimony from VEs when discussing Job Browser Pro or other software,

even where – as here—a VE begins by testifying generally that her opinion is based on her knowledge and experience.  R. 64.  Instead, the Eleventh Circuit  indicated that in determining the number of available jobs the VE's analysis should proceed as follows: determine the total number of jobs available in the proper SOC group; determine how many DOT codes are included in that SOC group; estimate the number of available jobs for the particular DOT code; and "provide *some explanation* for how [s]he arrived at that latter number."  *Id.* (emphasis added).  The undersigned reads *Goode* as suggesting that the Job Browser Pro software is an acceptable method of fulfilling the latter requirement.

While acknowledging the non-binding caselaw cited by Plaintiff, the undersigned finds the VEs testimony in this case comports with the Eleventh Circuit's opinion in *Goode* and thus provides substantial evidence to support the ALJ's determination.  There is no indication in this case that the VE based her testimony on inaccurate determinations or that she did not also consider he professional experience.  Indeed, while testifying about DOT jobs an individual with Plaintiff's age, education, work history, and RFC could perform, the VE explicitly stated that her testimony was "based on my education, training, and knowledge of the labor market."  R. 64.  The ALJ noted the VE "has experience in vocational rehabilitation services, performing labor market surveys, training other vocational consultants, conducting vocational training programs, and developing knowledge of the Dictionary of Occupational Titles and Selected Characteristics of Occupations."  *Id.* at 22; *see also id.* at 240-41.  All of this, The ALJ found, "provides ample basis and background to accept her as a vocational expert and allow for her testimony regarding employment numbers in the national economy, pursuant to the regulations and SSRs."  *Id.*  Despite receiving her qualifications 10 days before the hearing, Plaintiff's counsel did not cross-examine the VE on her qualifications.  *Id.*  Also, although the record was held open for two weeks after the hearing so Plaintiff's counsel could obtain second opinions and other verification of the VE's testimony, nothing was submitted relating to these issues

post-hearing. *Id.* Given the foregoing, the VE's testimony provided substantial evidence for the ALJ's determination.

## CONCLUSION

For the foregoing reasons, the undersigned respectfully recommends that Plaintiff's Motion for Summary Judgement (DE 19) be **DENIED**, and Defendant's Motion for Summary Judgment (DE 20) be **GRANTED**.

The parties shall have fourteen (14) days from the date of this Report and Recommendation within which to file objections, if any, with the Honorable Robin L. Rosenberg, the United States District Judge assigned to this case. If a party does not intend to object to this Report and Recommendation, that party shall file a notice of such within five (5) days of the date of this Report and Recommendation.

**DONE AND SUBMITTED** in Chambers at Fort Pierce, Florida, this 16th day of February, 2021.

_____
SHANIEK M. MAYNARD
UNITED STATES MAGISTRATE JUDGE